**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CLIFFORD HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 12 C 6258 |
| v. | ) | |
| | ) | Judge John J. Tharp, Jr. |
| ELECTRO-MOTIVE DIESEL, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Clifford Harris filed this suit alleging that his former employer, Defendant

Electro-Motive Diesel, Inc. ("EMD"), violated Title VII by engaging in Sexual Harassment

(Count I), Unlawful Retaliation (Count II), Race Discrimination (Count III), and Religious

Discrimination (Count IV). EMD has moved for summary judgment on all four counts. In

response to the motion, Harris has abandoned his claims for sexual harassment and race

discrimination. On the retaliation and the religious discrimination claims, Harris has failed to

adduce evidence sufficient to support a jury verdict in his favor, so EMD's motion is granted.

## BACKGROUND[1]

Plaintiff Clifford Harris is an African-American of Haitian descent. He is a practicing

member of the Voodoo religion. In 2006, he was hired as an employee of Defendant Electro-

---

[1] Summary judgment is appropriate if "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56. In employment discrimination cases, just as with any civil case, the Court construes all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532–33 (7th Cir. 2013). Because this is the defendant's motion, the Court considers the undisputed facts offered in the Defendant's Statement of Facts ("Def.'s SOF"), Dkt. 27, and any facts supported by the record in the Plaintiff's Statement of Additional Facts ("Pl.'s SOAF"), Dkt. 35.

Motive Diesel, Inc., a company in the business of assembling diesel-electric locomotives and diesel-powered engines.

In 2007, Harris worked under the supervision of Keith King. At the beginning of each shift, King conducted a daily prayer with all of the employees under his supervision. James Randolph, another supervisor, also participated in these prayers with the employees under Randolph's supervision. Randolph and King are both Christians and, for an unspecified period of time, attended the same church. These daily pre-shift prayers ended sometime in 2007. Shortly thereafter, in late 2007, Randolph became Harris's supervisor. Randolph was an ordained Christian minister who was "outspoken about his religion" in the workplace. Pl.'s SOAF, Dkt. 35, at ¶ 10.[2]

Harris also freely discussed his own religion at work, and his coworkers and supervisors were aware that Harris practiced Voodoo. Randolph testified that he had twice overheard coworkers call Harris's religion "crazy, crazy stuff," but that he would simply "walk away." *Id.* at ¶ 19. Harris and his coworkers John Vasquez and Yoshayah Yehudah each testified that they overheard Randolph call Harris "the devil" or that Harris's religion was "evil."[3] Other coworkers also expressed unease about Harris's practices, which twice resulted in Harris being called into

---

[2] EMD disputes several factual allegations relating to Randolph's behavior by pointing out that other witnesses' testimony is inconsistent with Randolph's deposition testimony. On this motion, the Court cannot weigh the relative credibility of competing testimony. Rather, the question on summary judgment is whether any reasonable juror could believe the testimony in favor of Harris, the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 933 (7th Cir. 1997).

[3] EMD argues that these statements are inadmissible hearsay and cannot be considered by the Court. *See* Def.'s Resp. to PSOAF, Dkt. 42, at ¶ 14. Harris does not offer these statements as proof of the truth of Randolph's statements (that Harris actually is "the devil" or that his religion actually is "evil"), but rather to prove that Randolph said them. *See* Fed. R. Evid. 801(c)(2). The sworn declarations of Yehudah and Vasquez, as well as the deposition of Harris, represent that each of the witnesses personally heard the statements being made.

meetings with supervisors—once when Harris was accused of blowing Voodoo dust on a supervisor, and another when Harris allegedly bumped into a coworker and muttered words perceived by the coworker to be related to Voodoo. Harris filed a charge with the Equal Employment Opportunity Commission ("EEOC") on January 11, 2010, alleging that "throughout [his] employment," he had experienced "religious harassment and derogatory comments." EEOC Charge, Dkt. 41-A. Harris did not further describe the "derogatory comments" referenced in that complaint.

About six weeks later, Harris's locker was vandalized. Sometime shortly before February 20, 2010, graffiti—in the form of the numeral "666"—appeared on Harris's locker. Pl.'s Resp. to DSOF, Dkt. 34, at ¶ 14. Harris told his coworkers not to write on his locker, but did not report the incident to any EMD supervisors. Harris Dep., Dkt. 27-2, at 137:17–138:3. At the end of his shift on February 20, 2010, Harris discovered additional graffiti on his locker that contained the phrases "Resputia," "Damien," "Ms. Melodie N Cliff," "Call me now!!!! Mon," "Dracula's locker," "Transylvanian Whore," "Voodoo Bitch," and Harris's first name, "Clifford." Pl.'s Resp. to DSOF, Dkt. 34, at ¶ 15. In addition, the graffiti included a caricature of Harris with red eyes and "cartoonish" moles—corresponding to where Harris actually has moles—a drawing of a snake, a drawing of a horned animal head, and a pentagram. *Id.* Harris was also distressed to find a fluid-filled condom attached to the lock in such a way that unlocking the locker would require handling the fluid-filled condom.

Harris then called the shift supervisor, who Harris believes may have been Randolph, to report the vandalism. He did not speak to the supervisor, but left a message about the condom and the graffiti. Harris did not work the next day, Sunday, February 21, 2010, and does not remember whether anyone at EMD worked that day. When Harris returned to work on Monday,

February 22, 2010, Harris noticed that the graffiti and condom were still on his locker. Sometime that morning, after the shift began, Harris reported the vandalism again, this time in person to Randolph, and requested that it be removed. When the vandalism had not been removed by Wednesday, February 24, Harris told Randolph that he would escalate the complaint to the Labor Relations Department. At some point that day, EMD photographed the vandalism, interviewed Harris, and removed the graffiti by painting over the locker. EMD also issued a memorandum to its employees warning that harassment of fellow employees or defacing company property would result in discipline, including possible discharge. EMD also began requiring its supervisors to check the locker room regularly, and Harris did not experience any more vandalism or other harassment on the basis of his religion. EMD never discovered the perpetrator(s) of the locker vandalism.

In April 2010, John Howard became Harris's supervisor. According to Harris, on April 12, 2010, Howard told Harris that he was "sexy." Pl.'s SOAF, Dkt. 35, at ¶ 35. Harris told Howard that the comment was unwelcome. Later that day, Howard touched Harris on the shoulder, and Harris filed a complaint with his union committeeman stating that he was being sexually harassed by Howard. After another incident on April 15, in which Harris accused Howard of unwanted touching, Harris filed a formal grievance with Lehman Tidwell,[4] his union representative. Harris was temporarily placed under another supervisor for the remainder of that Friday shift, but EMD returned Harris to Howard's supervision for the next shift the following week.

---

[4] The parties' submissions are inconsistent as to whether the union representative is named "Lehman Tidwell" or "Lehman Tidewell." The deposition transcripts consistently use "Tidwell," so the Court assumes that "Tidwell" is the correct spelling.

Shortly after Harris filed his sexual harassment complaint with the union, either on April 22 or 23, 2010, Harris signed a sheet indicating that he was available to work overtime on Saturday, April 24, 2010. Harris maintains that he verbally communicated that he did *not* want to work that Saturday and had been induced to sign the wrong column on the sheet when Howard and Randolph confused him with other unrelated paperwork. Harris did not show up for work on April 24. EMD recorded this as a violation of its attendance policy, worth 1.5 disciplinary points, which brought Harris's total accumulated points to 10.5. Under EMD policy, accumulating 10 points required a 30 day suspension, so EMD suspended Harris until May 26, 2010. *See* Reported Violation, Dkt. 36-7, at 1.

During his suspension, Harris filed a charge with the EEOC and a grievance with the union. The EEOC charge, filed on May 12, 2010,[5] alleged sexual harassment and retaliation in violation of Title VII. The union grievance was settled by reducing Harris's point total to 7 points and crediting Harris with the 17 days already served if he were ever suspended again. *See id.* at 2. Around the same time, EMD concluded its internal investigation into the sexual harassment allegations and determined that although there was insufficient evidence to sustain Harris's allegations, it would be better if Harris were moved to a different team.

Nonetheless, Harris did not return to work at EMD. Instead, Harris applied for medical leave, which EMD approved. In September 2010, MetLife, the insurer, denied Harris's short-term disability claim. Harris appealed the MetLife decision, but EMD had not received any

---

[5] At some point in time between the filing of his first EEOC charge on January 11, 2010, and his third charge on May 12, 2010, Harris also filed an EEOC charge numbered 440-2010-02158. *See* Am. Compl., Dkt. 13, at ¶ 9. Neither party has submitted a copy of this EEOC charge to the Court, and the Court is unable to determine the issues raised in the charge or the date that the charge was filed.

notice of this appeal.[6] Because Harris did not return to work as EMD expected, EMD terminated

Harris on November 17, 2010. Harris filed an amended charge with the EEOC in July 2011,

alleging that his termination also constituted retaliation and sex discrimination, but does not now

dispute that the reason for the termination was his failure to return to work rather than retaliation.

## DISCUSSION

### I.     Hostile Work Environment

As a preliminary matter, the Court must determine which time periods to consider in

adjudicating Harris's Title VII claims. Plaintiffs pursuing Title VII claims may only sue on

discriminatory acts first included in a charge with the Equal Employment Opportunity

Commission ("EEOC"), and may only file EEOC charges for discriminatory acts occurring

within the previous 300 days.[7] EMD argues that because Harris filed his first EEOC charge[8] on

January 11, 2010, any conduct occurring prior to March 17, 2009 is untimely. The statute of

limitations takes a slightly different form for hostile work environment claims, though, because a

hostile work environment over a period of time is a "single unlawful employment practice," and

any EEOC charge brought within 300 days of the most recent hostile act may consider earlier

acts as part of the same continuing violation. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S.

---

[6] It is undisputed that at the time of Harris's termination EMD did not have notice that Harris had appealed MetLife's decision. Pl.'s Resp. to DSOF, Dkt. 34, at ¶ 68.

[7] The charge-filing period is 300 days, rather than 180, because Illinois has a state agency, the Illinois Department of Human Rights ("IDHR"), that is authorized to address claims of unlawful discrimination in the workplace. *See* 42 U.S.C. § 2000e-5(e)(1); 775 ILCS 5/7-101. If the EEOC and IDHR decline to file a civil action on behalf of the employee, the employee receives a "Right to Sue" letter and may bring a civil action within 90 days. *See* 42 U.S.C. § 2000e-5(f)(1).

[8] After commencing this case, Harris received another Notice of Right to Sue from the EEOC relating to later-filed EEOC charges, and the Court granted Harris leave to amend his complaint to include the allegations relating to these later charges.

101, 117 (2002); *Pruitt v. City of Chicago*, 472 F.3d 925, 927 (7th Cir. 2006). For cases such as this one, where an employee alleges harassment outside the statutory period that is part of the same hostile work environment occurring during the statutory period, courts may consider the earlier facts as part of the claim. *Nat'l R.R. Passenger Corp.*, 536 U.S. at 118. Therefore, the Court will consider the harassment alleged to have occurred in 2007 and 2008, though as will be discussed, it does not materially advance Harris's hostile work environment claim.

Title VII prohibits employers from "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To meet this description, the work environment must be "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotation omitted). To survive summary judgment on a hostile work environment claim in the Seventh Circuit, an employee must "provide sufficient evidence that demonstrates: '(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability.'" *Nichols v. Mich. City Plant Planning Dept.*, 755 F.3d 594, 600 (7th Cir. 2014) (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)). Rather than carving up individual incidents of harassment and separately analyzing each incident individually, courts must look at the totality of the circumstances. *Hall v. City of Chicago*, 713 F.3d 325, 331 (7th Cir. 2013).

## A.    Offensiveness and Discriminatory Motive

Harris has presented sufficient evidence for a reasonable jury to find that he was subjectively offended by the work environment at EMD, which EMD does not appear to dispute. The subjective element is not difficult to meet on summary judgment. *See Hall*, 713 F.3d at 332

("[W]e have implied this burden is not high."). In addition to testifying that he has subjectively perceived the environment to be hostile, Harris also acted in a way that indicates being offended by the graffiti incident. Harris reported the graffiti to the acting supervisor immediately upon discovering it and again at the start of his next shift. During the second conversation, Harris threatened to escalate the report to EMD's Labor Relations Department. After complaining to his union steward, a formal grievance was filed on Harris's behalf. From these actions a jury could infer that Harris was subjectively offended by the locker graffiti.

Nor is there any substantial argument that the graffiti incident is objectively offensive.[9] The graffiti on Harris's locker contained references to the occult, voodoo, and the devil ("666," "Damien,"[10] "Dracula's locker," "Transylvanian Whore," "Voodoo Bitch," the snake, pentagram, and horned animal), Pl.'s Resp. to DSOF, Dkt. 34, at ¶ 15, which overtly mocked Harris's religion. The caricature mocking Harris's physical appearance, references to Harris's

---

[9] For the reasons discussed further below in connection with the requirement that actionable harassment must be severe or pervasive, the Court concludes that Randolph's use of the term "devil" in reference to Harris was not objectively offensive. Nor do Harris's allegations concerning off-duty prayer meetings and the overt religiosity of some of his co-workers describe objectively offensive conduct. Title VII *requires* employers "to make reasonable efforts to accommodate the religious practices of employees." *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012). It would put employers between Scylla and Charybdis, then, to conclude that accommodating the religious practices of some employees could be considered *objectively* offensive to employees who practice other religions, particularly in the absence of evidence that the employer engaged in conduct that coerced employees to participate in such activities. Harris does not allege, and has adduced no evidence to show, that King or Randolph required, or even pressured him, to participate in the pre-shift prayer services.

[10] EMD disputes that there is record evidence to support Harris's theory that "Damien" is "a reference to the antichrist and child of the devil in the series 'The Omen,'" Def.'s Resp. to PSOAF, Dkt. 42, at ¶ 23, but the Court is not deciding in this motion whether the graffiti actually referenced a particular film series. The inquiry on this motion is whether a jury could infer that the graffiti was motivated out of hostility to Harris's religion. The Court takes judicial notice that "Damien" is a name that has been associated with the devil in various fictional works in popular culture. *See* Fed. R. Evid. 201(b)(2); *see generally The Omen* (Fox 2006); *South Park: Damien* (Comedy Central television broadcast Feb. 4, 1998); Mike W. Barr & Jerry Bingham, *Batman: Son of the Demon* (1987); *The Omen* (Fox 1976).

name, and the graffiti's location on Harris's locker show that the harassment was unmistakably directed at Harris personally. Any reasonable person would take umbrage if the victim of similar religiously-themed vandalism.

For similar reasons, a reasonable jury could also find that the graffiti was motivated by Harris's religion. As discussed above, a jury could infer from the references to the occult, voodoo, and other religious symbolism that religious hostility motivated the vandalism. A jury may even conclude that harassment that is not facially discriminatory nonetheless has discriminatory motive when "sufficiently intertwined" with comments made towards an employee's religion. *See Shanoff v. Ill. Dept. of Human Servs.*, 258 F.3d 696, 705 (7th Cir. 2001). The nonreligious vandalism, such as the liquid-filled condom, caricature of Harris's face and name, and mockery of Harris's race or national origin,[11] appeared at the same time and in the same place as the religious references. A jury could infer from the graffiti's religious comments that the entirety of the graffiti was motivated by discriminatory hostility.

### B.      Severity or Pervasiveness

Determining the severity or pervasiveness of workplace harassment requires an analysis of the totality of the circumstances, including: "(1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably

---

[11] Harris is not pursuing claims for discrimination based on his national origin. Harris speculates that the "Call Me Now!!!!" and "mon" graffiti references Ms. Cleo, a purported Jamaican telephone psychic whose television marketing was ubiquitous in the late 1990s and early 2000s. Harris Dep., Dkt. 36-1, at 144:11–145:1; *see also* Press Release, Fed. Trade Comm'n., FTC Charges "Miss Cleo" Promoters with Deceptive Advertising, Billing and Collection Practices (Feb. 14, 2002), *available at* http://www.ftc.gov/news-events/press-releases/2002/02/ftc-charges-miss-cleo-promoters-deceptive-advertising-billing-and.      Although Harris is of Haitian descent, and not Jamaican, a jury could infer that the comparison was intended to insult Harris's race or national origin.

interferes with an employee's work performance; and (5) whether it was directed at the victim." *Nichols*, 755 F.3d at 601. No single factor is required for, or dispositive of, this analysis. Because Title VII targets workplace discrimination, however, the "key inquiry" in assessing whether conduct created a hostile work environment is whether it was "so severe or pervasive that it altered the conditions of the employment relationship." *Id.*; *see also Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 535 n.14 (7th Cir. 1993) ("[A]lthough proof of an adverse impact on the plaintiff's work performance is not required, it remains a particularly important factor in the hostile environment analysis.").

Most of these considerations favor EMD. First, it cannot reasonably be said that Harris was subjected to "pervasive" hostility toward his religious beliefs. His claim essentially involves a single incident of graffiti vandalism. Other than the graffiti incident, the only arguably offensive conduct Harris identifies are several alleged comments by Randolph purportedly using the term "devil" in reference to Harris.[12] Harris alleges that over the course of his employment at EMD from 2007 to 2010, he heard Randolph refer to him as "the devil" on three occasions, but the record reflects that this is an overstatement. In each of the instances Harris described, Harris acknowledges that Randolph was not speaking to him but to others. Further, in two of the three comments, even as recounted by Harris, Randolph referred to him only as "that devil" or "this devil," not as "the Devil"—in other words, in a manner that referred to Harris as a troublemaker rather than as the embodiment of all that is evil. *See* Harris Dep. 47:18–20 ("if you're going to let that devil keep on getting you in trouble, he's going to cause you to lose your job"); *id.* at 55:20–21 ("I hear him saying, here come this devil"). These three isolated comments, which occurred

---

[12] The Court notes first that the Court reporter's use or non-use of a capital letter to begin the word "devil" in deposition transcripts has no evidentiary significance and so has been disregarded.

over the course of four years of employment and did not target Harris directly, and several of which were innocuous in any event, do not appreciably move the scale on cumulative severity or pervasiveness. *See, e.g.*, *Yuknis v. First Student, Inc.* 481 F.3d 552, 554 (7th Cir. 2007) (describing "second-hand harassment" as "categorically less serious than harassment specifically aimed at the plaintiff"); *Russell v. Bd. of Trs. of Univ. of Ill. at Chi.*, 243 F.3d 336, 343 (7th Cir. 2001) ("When harassing statements are directed at someone other than the plaintiff, the impact of such second hand harassment is obviously not as great as the impact of harassment directed at the plaintiff.") (internal quotation omitted). Whether these comments are deemed to have been harassing or not, they add little, if anything, to the totality of circumstances relevant to Harris's claim that religious harassment was so pervasive or severe as to have altered the conditions of his employment relationship with EMD. And, indeed, Harris does not argue that they do. *See* Pl.'s Resp., Dkt. 33, at 11 (argument that conduct was severe and/or pervasive predicated on theory that one incident can give rise to hostile work environment claim).

A single incident of discrimination can, in theory, suffice to create a hostile work environment. *See, e.g.*, *Daniels v. Essex Grp., Inc.*, 937 F.2d 1264, 1274 n.4 (7th Cir. 1991) (hypothesizing that a single, isolated cross burning would suffice as a hostile work environment). *But see Nat'l R.R. Passenger Corp.,* 536 U.S. at 115 ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct."); *id.* at 117 ("A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'") (citing 42 U.S.C. § 2000e–5(e)(1)). But the thresholds for "pervasiveness and severity are, to a certain degree, inversely related." *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 951 (7th Cir. 2005). What a single incident of harassment lacks in pervasiveness, it must make up for in severity. "The Supreme Court teaches that isolated

incidents, unless 'extremely serious,' will not support a hostile work environment claim. That makes sense, because in order to be actionable under the pertinent statutes, isolated incidents must be so severe that they 'amount to discriminatory changes in the terms and conditions of employment.'" *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 648 (7th Cir. 2011) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). There are many cases that refer to this inverse relationship, but few that have actually found a single incident of harassment sufficient to create a hostile work environment.[13] In his brief, Harris recites the rule that "one extremely serious act of harassment" could be actionable, but he has not identified any cases predicated on a comparable single incident of harassment.

As discussed above, the graffiti on Harris's locker is objectively offensive, but this is not the rare case in which an isolated incident of harassment is so egregious as to create an actionably hostile work environment. An unpleasant, even offensive, environment is not the same thing as an abusive environment that gives rise to an actionable hostile environment claim. *Saxton*, 10 F.3d at 534–35. The sort of non-physical, verbal harassment at issue in this case, though it may cause "significant discomfort and distress" even on more than one occasion, is not the sort of conduct held to be sufficiently severe or pervasive to give rise to a hostile work environment claim. *See, e.g.*, *Nichols*, 755 F.3d at 601, 603 (holding that "one utterance of the n-

---

[13] Examples of cases in which a single incident has been held to be sufficiently severe to support a hostile environment claim include cases involving sexual abuse, *e.g.*, *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 136 (2d Cir. 2001) (holding that a single incident of rape is "sufficiently egregious"); *Al-Dabbagh v. Greenpeace, Inc.*, 873 F. Supp. 1105, 1111 (N.D. Ill. 1994) ("no question" that a single instance of rape establishes a hostile work environment), or other forms of physical violence, *e.g.*, *Smith v. Sheahan*, 189 F.3d 529, 531, 534 (7th Cir. 1999) ("Breaking the arm of a fellow employee because she is a woman, or, as here, damaging her wrist to the point that surgery was required, because she was a woman, easily qualifies as a severe enough isolated occurrence to alter the conditions of her employment.") (citing *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1072 (10th Cir. 1998)).

word" directed at the plaintiff was offensive but not sufficiently pervasive to support a hostile work environment claim); *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) ("An objectively hostile work environment will not be found where most of the conduct that forms the basis of a plaintiff's claim consists of derogatory statements made by supervisors or co-workers out of her hearing, and the rest is isolated and not particularly severe.") (internal quotations omitted); *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir.2002) (handful of offensive comments, most of which were by fellow employees over a year-and-a-half period, were not sufficient to raise a jury issue). *Compare, e.g.*, *Venters v. City of Delphi*, 123 F.3d 956, 976 (7th Cir. 1997) ("unrelenting" comments from a supervisor about an employee's "sinful" life, including accusations of sex with family members and animal sacrifice, coupled with encouragement to commit suicide and sincere threats of termination, held to be sufficiently severe or pervasive to allow a jury to find a hostile work environment), *and Shanoff*, 258 F.3d at 705 (supervisor threats to "keep [an employee's] white Jewish ass down," statements like "I hate everything that you are," expressions of delight at the employee's failing health, and interference in career progression sufficient to evince direct, unambiguous hostility to the employee's race and religion).

Although this graffiti defacing Harris' locker was offensive, ignorant, and juvenile, it constituted verbal, rather than physical, abuse and did not require Harris to engage in, or subject him to, any humiliating conduct. Nor did the graffiti include the use of highly-charged epithets, a fact that distinguishes this case from several other cases involving graffiti where sufficient evidence to support a hostile work environment claim was adduced. *See, e.g.*, *Cerros*, 398 F.3d at 948, 951 (comments and graffiti constituting "an appalling litany of misconduct" involving use of derogatory epithets targeting Hispanics); *Daniels*, 937 F.2d at 1274 (use of racial epithets

targeting African-Americans). Nor did the graffiti include any express or implicit threats to Harris, further distinguishing this case from others involving graffiti. Further, unlike cases in which a supervisor leveraged workplace authority to harass the employee from a position of power, *see, e.g.*, *Hall*, 713 F.3d at 331; *Shanoff*, 258 F.3d at 705; *Gentry*, 238 F.3d at 851; *Venters*, 123 F.3d at 976, in this case there is no evidence that Randolph or any other supervisor was involved in the harassing conduct.[14]

Which brings us to "the key inquiry," *Nichols*, 755 F.3d at 601, as to whether the allegedly harassing conduct altered the terms and conditions of employment. Significantly, Harris has adduced no evidence that this unfortunate episode had any effect whatsoever on his job. Harris's comparison of his situation to that of the plaintiff in *Hall*, 713 F.3d at 328–29, is badly off-mark. There, the plaintiff had been physically segregated from all other co-workers by an assignment that was complete makework, other employees had been forbidden to speak to or associate with the plaintiff, and the plaintiff had been subjected to several incidents of verbal and even physical abuse. *Id.* Harris endured nothing remotely similar. He states that he could not access his locker for several days, but does not allege that the incident impeded the performance of his duties in any way, or caused him to modify his work routine, or gave rise to any complaints about his performance by Randolph or any other supervisor. So far as the record reflects here, this incident had no ill effect on Harris's employment relationship with EMD at all. Although Harris reported the incident to Randolph and also told him that he was going to report it to the company's Labor Relations department, he does not allege that Randolph, or anyone else

---

[14] This is a distinct question from whether there is a basis for employer liability through supervisor participation in harassment. It is possible for a supervisor to participate in harassment (thereby implicating the employer's liability) without actively abusing his own authority to harass an employee.

at the company, took any retaliatory action against him in response or that the harassment continued.

Under the totality of the circumstances, then, the Court concludes that a jury could not reasonably find that Harris was subjected to a hostile work environment on the basis of his religion.

### C.    Basis for Employer Liability

Harris's hostile work environment claim also falls short in establishing a basis for employer liability. For an employer to be liable for a hostile work environment, the plaintiff must prove either "(1) that a supervisor participated in the harassment that created the hostile work environment or (2) that [the employer] was negligent in discovering or remedying harassment by the coworkers." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010).

To support the supervisor participation theory, Harris argues that Randolph, his supervisor,[15] instigated the coworker harassment by "brainwash[ing]" employees and referring to Harris as "The Devil" and to his religion as "evil." Pl.'s Resp., Dkt. 33, at 13. Although Harris testified as to his own speculation that Randolph had "brainwash[ed]" employees, Harris offers no facts from which this conclusion could be inferred. *See id.* Indeed, Harris acknowledges that he regularly told coworkers about his religious beliefs and that several raised concerns about him, so there is no basis to infer that instigation or brainwashing by Randolph was a cause of coworker harassment. It is true that Randolph investigated coworker complaints that accused

---

[15] Neither party disputes that Randolph was Harris's "supervisor," but neither defines that term or discusses whether Randolph had sufficient authority over Harris to qualify as a "supervisor" for purposes of assessing employer liability under Title VII. Generally speaking, "the paradigmatic supervisor" for Title VII purposes is one who had authority to fire the plaintiff, *Doe v. Oberweis Dairy,* 456 F.3d 704, 716 (7th Cir. 2006), but there is no evidence in the record as to whether Randolph possessed such authority. Since the defendant has not raised the point, the Court will not address it further.

Harris of blowing Voodoo dust or muttering Voodoo prayers at coworkers, Pl.'s SOAF, Dkt. 35, at ¶¶ 11, 22, but this was a response to employee complaints about Harris's conduct and cannot reasonably be construed as "participation" in the harassment that is the subject of Harris's complaint, specifically the graffiti vandalism of Harris's locker months or years later.[16] Further, Harris does not claim that Randolph handled these complaints inadequately or took any disciplinary action against Harris as a result of the complaints. The only evidence cited by Harris where Randolph was even aware of coworkers badmouthing Harris's religion is testimony that Randolph simply "walked away" from such conversation, *id.* at ¶ 19, which is the antithesis of participation. Finally, and as discussed above, the isolated incidents where Randolph may have referred to Harris as "a devil," or even "the devil," do not rise to the level of supervisory "participation" in harassment. *See supra* note **Error! Bookmark not defined.**.

Harris has also failed to present sufficient evidence of employer negligence in discovering or remedying coworker harassment. To begin, Harris overstates his case in arguing that EMD failed to respond to the locker vandalism for four days. Harris testified that he left a phone message for whoever the acting supervisor was on February 20, 2010, that he was not sure whether anyone at EMD worked on Sunday, February 21, or whether any supervisor knew of the vandalism before the morning of Monday, February 22. *See* Harris Dep., Dkt. 36-1, at 155:11–161:16. Thus, the evidence establishes that the first time Harris can establish that he directly reported the incident was "before lunch" on February 22; two days later, on February 24, EMD had removed the graffiti.

---

[16] The record reflects that these coworker complaints occurred sometime in "2008 or 2009," and Harris's locker was vandalized in February 2010. Pl.'s SOAF, Dkt. 35, at ¶ 22.

In any event, whether EMD's response took two days, or four, is largely immaterial in comparison to the larger question of whether the response was effective: It was. The graffiti and the condom were removed. Pl.'s Resp. to DSOF, Dkt. 34, at ¶ 24. EMD responded by warning employees in writing that such harassing or threatening behavior would be punished, possibly with termination, and implemented a policy of regular supervisor locker room checks. *Id.* at ¶¶ 25–26. By Harris's own admission, there were no more incidents of vandalism after EMD implemented these policies. *Id.* at ¶ 27. Harris complains that EMD's investigation was inadequate because the harassers were never identified, but "Title VII requires only that employers take action reasonably calculated to stop unlawful harassment; that requirement does not necessarily include disciplining the employees responsible for past conduct." *Muhammad v. Caterpillar, Inc.*, 767 F.3d 694, 698 (7th Cir. 2014). EMD's prompt response was sufficient because not only was it "reasonably calculated" to end the harassment, it was successful in doing so. *Id.*; *see also Savino v. C.P. Hall Co.*, 199 F.3d 925, 933–34 (7th Cir. 1999) (holding that an employer's response could be adequate even if *not* successful at ending harassment). There is no basis in this record to conclude that EMD turned a blind eye toward the incident or failed to take sufficient steps to remedy the problem and to keep it from recurring.

Harris also complains that union committeeman Lehman Tidwell, who advised Harris not to pursue a complaint against Randolph because his comment that Harris was "the devil" was not a big deal, did not respond adequately. Tidwell, however, was not a supervisor (at least so far as the record shows) and Harris has made no argument that Tidwell was a "supervisor" under the meaning of Title VII. The record reflects that Harris complained to Tidwell because he was Harris's union representative, not because he was Harris's supervisor, and EMD is not responsible for the actions of Tidwell in his role as Harris's union representative. Because Harris

has failed to show that a reasonable jury could find that the harassment was severe or pervasive or that EMD was liable for the harassment, EMD is entitled to summary judgment on the hostile work environment claim.

## II. Retaliation

Title VII prohibits employer retaliation against employees who engage in statutorily protected activity. *See* 42 U.S.C. § 2000e-3. Harris opts to proceed under the direct method of proving unlawful retaliation, which requires either direct or circumstantial evidence to prove that "(1) the employee engaged in statutorily protected activity; (2) the employee suffered an adverse employment action; and (3) a causal link exists between the two." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 537 (7th Cir. 2013). EMD does not dispute that Harris engaged in protected activity or that Harris suffered adverse employment actions when he was suspended and ultimately terminated. EMD argues, however, that it suspended Harris for violating EMD's attendance policy and that it terminated Harris for failing to return after his suspension. Harris's response brief argues that a reasonable jury could find from the "strong circumstantial case" that a causal link existed between the suspension and the filing of Harris's sexual harassment complaint only one week earlier. Pl.'s Resp., Dkt. 33, at 14. He does not argue, however, that his termination was in retaliation for his sexual harassment complaint and he did not dispute EMD's fact statement that EMD terminated Harris "[b]ecause Harris did not return to work at EMD after he was informed by MetLife that his short-term disability claim had been denied." Pl.'s Resp. to DSOF, Dkt. 34, at ¶ 66 ("Undisputed."); *see also* Pl.'s Resp., Dkt. 33, at 13–14 (retaliation argument predicated solely upon suspension).

With respect to whether Harris has adduced adequate evidence to support a retaliation claim as to his suspension, the Seventh Circuit has repeatedly held that "suspicious timing will 'rarely be sufficient in and of itself to create a triable issue'" as to retaliation. *Kidwell v.*

*Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005)). Harris argues, however, that in addition to the suspicious timing, the evidence that he verbally told Howard and Randolph that he did not intend to work overtime creates a fact issue. Pl.'s Resp., Dkt. 33, at 14. Harris contends that a jury could infer that Howard knew, despite Harris's mistake in checking the wrong box on the overtime availability form, that Harris did not intend to work overtime the next day and, accordingly, that he was disciplined not for that reason but to retaliate against him for making a sexual harassment complaint. *Id.* That seems a thin argument,[17] but one that might suffice to get Harris to a jury on the retaliation claim—but for another problem.

Even assuming Harris's argument is correct, his retaliation claim fails as a matter of law because his own theory of what happened severs any causal link between the adverse employment action and statutorily protected activity. To recover for Title VII retaliation, the plaintiff must show that the cause of an adverse employment action is statutorily protected activity. *Majors*, 714 F.3d at 537. Title VII's retaliation provisions only protect employees for participation in investigations by official bodies authorized to enforce Title VII, not participation in purely internal investigations conducted solely by the employer. *Hatmaker v. Memorial Med. Ctr.*, 619 F.3d 741, 746–47 (7th Cir. 2010). Harris's statement of facts and response brief focus

---

[17] EMD argues that Harris's "self-serving" testimony, rebutted by EMD's evidence, is insufficient to create a jury issue on this question. In making this argument, EMD's counsel ignores the myriad Seventh Circuit opinions that put to rest the notion that a plaintiff's own testimony is inadequate to create a jury question. *See, e.g.*, *Hill v. Tangherlini*, 724 F.3d 965, 967 ("As we have repeatedly emphasized over the past decade, the term 'selfserving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment."). A plaintiff's testimony, standing alone and unadorned, is sufficient to create a jury issue, even if the defendant has marshalled an abundance of evidence to contradict it. *See id.* at 967 n.1 ("[T]oday we make clear that the following [twenty-four] cases are overruled to the extent that they suggest a plaintiff may not rely on 'self-serving' evidence to create a material factual dispute.").

on a complaint filed with his union committeeman and a formal grievance filed with his union representative in April 2010, and Harris contends that his suspension was retaliation for having taken these actions. *See* Pl.'s Resp., Dkt. 33, at 14; Pl.'s SOAF, Dkt. 35, at ¶¶ 33–40. However, union or company investigations are not investigations "by an official body authorized to enforce Title VII." *Hatmaker*, 619 F.3d at 747. Therefore, even if Harris is correct that EMD suspended Harris because he lodged a sexual harassment claim with the union, Harris would not be entitled to recover on his retaliation claim.

Harris has not presented any evidence or argument that his suspension was motivated by retaliation for filing EEOC charges, which would be activity protected by Title VII. Harris's first EEOC charge does not allege discrimination based on sex, *see* EEOC Charge, Dkt. 41-A, and Harris's second EEOC charge has not been included in the record. Therefore, there is no basis for inferring that Harris's sexual harassment grievance, filed with his union, had any relation to the earlier EEOC charges. *See Hatmaker*, 619 F.3d at 747 (leaving open the possibility that Title VII retaliation provisions may apply to internal company investigations that begin *after* an EEOC charge is filed). And Harris's third EEOC charge, filed on May 12, and which asserted claims of sexual harassment and retaliation, had not even been filed when he was suspended in April, so plainly the suspension was not predicated on the filing of that charge. Moreover, that EEOC charge alleges that his suspension was retaliation for "complain[ing] to management," not for filing any earlier EEOC charge. *See* EEOC Charge, Dkt 27-2, at 41. Because Harris has not shown that a reasonable jury could find that his suspension was retaliation for engaging in statutorily protected activity (indeed, a jury could not be instructed that there was any statutorily protected activity with respect to the retaliation claim), EMD is entitled to summary judgment on the retaliation claim.

\*       \*       \*

For the reasons set forth above, EMD's motion for summary judgment (Dkt. 25) is granted in its entirety. Summary judgment is entered for EMD on all four counts.[18]


Dated: February 12, 2015

John J. Tharp, Jr.
United States District Judge

---

[18] Harris indicates in his brief that he has withdrawn his claims of sexual harassment and racial discrimination. At this juncture, however, judgment on those claims cannot be avoided by voluntarily dismissing them (and a voluntary dismissal would in any event require a motion pursuant to Fed. R. Civ. P. 41). Harris has therefore abandoned those claims, and it is therefore appropriate to grant summary judgment on those claims as well.